**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 1:06-CR-90-03** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **NICOLE LAVALLEE,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Pending before the Court is Defendant Nicole Lavallee's motion to suppress evidence

seized from her home in the course of a warrantless search conducted on February 27, 2006.

Specifically, Defendant Lavallee has moved to suppress evidence of the fact that Dawan Oliver, a

fugitive, was discovered and arrested in her home.  Additionally, Defendant seeks to suppress

certain false statements she made to an agent with the Federal Bureau of Investigation while

other law enforcement officers were conducting the search of her home.

**I.     Background**

Shortly after 8:00 a.m. on Friday, January 27, 2006, two federal agents and seven local

law enforcement officers affiliated with a fugitive recovery task force went to Nicole Lavallee's

home at 1561 Holloway Road, in Holland, Ohio, to search for Dawan Oliver, a fugitive who had

been indicted on December 7, 2005, on federal charges relating to prostitution of minors.  (Tr. 5,

19.)  These officers were eventually joined by two or three additional uniformed officers.  (Tr.

19.)  Matthew Eagles, the Coordinator of the Violent Crimes Fugitive Task Force for the

Cleveland division of the FBI, Toledo resident agency, testified that officers went to the home

with the intention of searching for Oliver.  (Tr. 5.)

Prior to arriving at 1561 Holloway Road, Federal agents had collected a significant

amount of information that lead them to believe that Oliver was currently staying at the Holloway Road residence.  (Tr. 6.)  For example, the fugitive task force had received information from a confidential source that Oliver was staying at the house.  (Tr. 53.)  Additionally, local law enforcement had advised the task force that Oliver was residing in the home and that police had seen two of Oliver's vehicles at the residence.  (Tr. 6, 53, 54.)  Tiffany Hill-Larson, an agent with the FBI, had also obtained local tax records showing that as recently as August 2005, Oliver had filled out forms on which he indicated that 1561 Holloway Road was his address.  (Tr. 7.)  Notwithstanding being in possession of the foregoing information, law enforcement officers did not apply for a warrant to search the home for Oliver.[1]  Instead, officers went to the house armed only with a computer printout from the National Criminal Informaton Center noting the existence of an outstanding warrant for a misdemeanor traffic violation for Lara Thoma, one of the residents of the home.[2]  (Tr. 8.)  The officers were also in possession of a warrant for Oliver's arrest.

Once the task force arrived at 1561 Holloway Road, Agent Eagles approached the front door of the house and knocked while other members of the task force took up positions

---

[1]      Agent Eagles testified that he "wasn't sure whether [they] had enough probable cause for a search warrant.  There was potential."  (Tr. 25.)

[2]      When asked the purpose of going to 1561 Holloway Road on January 27, 2006, Agent Eagles testified "[t]o look for Dawan Oliver."  (Tr. 8.)  The Government proceeded to ask whether there was any other purpose regarding any other occupant, and Agent Eagles responded "No".  (Id.)  The Government then asked whether there were "any warrants outstanding against any of the other occupants" to which Agent Eagles responded that there was a misdemeanor traffic warrant for Lara Thoma.  (Id.)  Notwithstanding the existence of a warrant for a minor traffic offense, it was clear from Agent Eagles testimony, and from the testimony of every other officer involved in the search, that the sole purpose of going to 1561 Holloway Road was to search for Dawan Oliver.

surrounding the premises.  Agent Eagles knocked at the door for approximately ten minutes

without receiving a response.  (Tr. 9-10.)  At around this time, one of the officers radioed that he

had observed a female looking out one of the windows on the north side of the house.  (Tr. 10,

33.)  Shortly thereafter, Officer Roger Rettig radioed the search team that he had heard people

"scrambling around" the rear first-floor bedroom.  (Tr. 33.)  Subsequently, Officer Rettig radioed

other officers that he could hear noises emanating from the rear of the second-floor that sounded

like furniture being moved around.  (Tr. 34.)  After several more minutes of knocking, Lara

Thoma approached the front door of the house, but did not unlock the door.  (Tr. 10.)  She asked

officers what they wanted, and when shown Agent Eagles's FBI credentials, she became irate and

verbally belligerent, screaming at officers to leave the house and denying their authority to arrest

her.  (Tr. 10, 34-37.)  Although as previously noted Agent Eagles had only an NCIC record, he

advised Thoma that he had a warrant for her arrest.  She retreated into the residence.  Eventually

Thoma went to the rear of the house where she engaged in further argument with officers before

unlocking a sliding glass door, at which point task force members opened the door, entered the

home, and placed her under arrest following a brief struggle.  (Tr. 35-36.)

Following Thoma's arrest, nearly every officer on the scene entered the house and, with

weapons drawn, began to conduct what Agent Eagles characterized as a "protective sweep" of

the residence.  (Tr. 15.)  Agent Eagles testified that officers "were looking for any area where

somebody may be hiding" and estimated that the search that followed Thoma's arrest took

approximately 45 minutes.  (Tr. 15, 25.)  The officers conducting the search testified that they

were particularly concerned about their safety because nearly 30 minutes had elapsed since the

task force arrived, and they believed Oliver would have had time to secret himself in any of a

number of areas in the home. (Tr. 16.) Additionally, Agent Eagles and other officers noticed that the house had a number of dead spaces and other structural irregularities that caused them to believe that Oliver's location might not be immediately apparent or would otherwise aid him in concealing himself from officers. (Tr. 16-17, 38, 66.)

One of the task force members, Officer Rettig, testified that the purpose in conducting a search of the home was to find Dawan Oliver:

> Q.    And what were your intentions at that time?
>
> A.    I was going to search the house.
>
> Q.    For what?
>
> A.    For the defendant – or for the suspect [Dawan Oliver] at the time.

(Tr. 37.) When asked whether there were any other purposes to the search, Officer Rettig responded, "No, sir, just for the purpose of the security of all of us." (Tr. 37.) With respect to the manner in which the search was conducted, Officer Rettig testified that the search was not a cursory search of the home but was instead a much more thorough search that involved officers searching rooms at least two times to "check each other's work." (Tr. 39.) Officer Rettig testified that it was "the intention of the officers during the first search to search every nook and cranny." (Tr. 46.) Despite this intention, Officer Rettig acknowledged that officers conducted a sweep of the house during the "first search" and did not locate Dawan Oliver. (Tr. 44.)

According to Officer Rettig, task force members actually conducted multiple searches of the home before eventually finding Oliver. He described the process as follows: "[the first search was] more of a quick one . . . say ten minutes. . . . The first search is a clean, quick sweep looking for a body, okay, in the most obvious places, the closet, under the bed, that type of thing.

4

And then you move on quickly after that. . . . Second searches are usually more time-consuming and meticulous, and they're a slow process.  You want to make sure you don't miss any area in the house where somebody could be hiding."  (Tr. 48, 51.)  Although Officer Rettig could not testify whether there were two or three searches of the entire home, Officer Rettig did testify that he personally searched the house twice.  (Tr. 48.)

A second task force member, Officer Robert Barboza, confirmed Officer Rettig's testimony that the search involved a preliminary sweep of the house followed by a second search during which officers backtracked and double-checked various places in the house to search for the suspect.  (Tr. 67.)  Officer Barboza estimated that the initial search of the house, during which Dawan Oliver was not discovered, could have taken up to 25 minutes and that during this time he searched "pretty much everything."  (Tr. 73.)  Rather than a series of searches, Officer Barboza characterized the search as a "continual search. . . . It never stopped."  (Tr. 75.)

Although Officer Barboza confirmed that Dawan Oliver was not discovered on the first search of the house, he "felt certain that the suspect in question was hiding, we just hadn't found him."  (Tr. 67.)  Accordingly, Officer Barboza decided to return to the rear bedroom on the second floor of the house to search the room again in case he "overlook[ed] something."  (Tr. 68.)  At this point, another member of the task force had moved a large dresser away from a wall in the room to reveal what appeared to be a "secret compartment".  (Tr. 68.)  The officers discovered two small door knobs sticking out of the wall which were attached to small doors. (Tr. 68.)  Officer Barboza alerted other members of the task force that he had found what he believed to be a "hiding chamber" and requested backup.  (Tr. 68-69.)  After additional support arrived in the room, the task force members moved the dresser, opened the doors, and discovered

5

Dawan Oliver lying prone in the hidden compartment.  (Tr. 69.)  At this point, Oliver was

arrested without incident.  (Tr. 70.)  Officer Barboza testified that he did not discover any

weapons during his search of the home.  (Tr. 71.)

      While Lara Thoma was detained in the kitchen following her arrest, and around the time

task force members began searching the house, Agent Eagles instructed Blair Gillespie and

Defendant Nicole Lavallee to sit on a couch in the living room.[3]  (Tr. 13, 26.)  Neither woman

was instructed that she could not leave, and neither was handcuffed.  (Tr. 14.)  Neither woman

was given Miranda warnings before they were questioned by FBI agents Eagles and Hill-Larson.

(Tr. 60.)  When the women had been seated, Agent Eagles asked them whether anyone else was

in the home and he inquired about Dawan Oliver's whereabouts.  (Tr. 14-15.)  Both women

responded that no one else was in the house, and both denied knowing Dawan Oliver by his

given name or by his street alias, "Thug."  (Tr. 14-15.)  Agent Hill-Larson also questioned the

women about a large shirt that she had observed in the living room, and Defendant Lavallee

advised her that the shirt belonged to her father.  (Tr. 56-57.)  The women remained seated in the

living room throughout the search of the home, and Agent Hill-Larson remained with them.  (Tr.

58.)

      Following Oliver's arrest and the resulting conclusion of the search, Thoma was

transported to the Holland, Ohio police department for the misdemeanor traffic warrant on which

she was arrested.  She was given an appearance date and released.  (Tr. 17.)

---

[3]      Agent Hill-Larson testified that the women were "requested" to sit on the couch.
(Tr. 58.)

II.     **Procedural History**

On March 1, 2006, a grand jury returned a two-count indictment charging Defendants

Lavallee, Gillspie, and Thoma with knowingly harboring a fugitive and conspiring to harbor a

fugitive; and with conspiring to make false statements to agents of the Federal Bureau of

Investigation and impede the due administration of justice.  (Doc. No. 1.)  Defendants were

arraigned before Magistrate Judge Smyser on March 14, 2006 and entered pleas of not guilty.  On

April 24, 2006, Defendant Lavallee filed the motion to suppress that is currently before the

Court.  (Doc. No. 35.)  The Government filed a brief in opposition to the motion on May 5, 2006.

The Court convened an evidentiary hearing on the motion on May 8, 2006 during which four

members of the task force involved in the search and arrests testified.

III.    **Discussion**

A.      **The Search of 1561 Holloway Road**

Defendant Lavallee has moved to suppress evidence of the fact that Dawan Oliver was

discovered in her home during the course of the warrantless search that followed Lara Thoma's

arrest, arguing that the search was unlawful and conducted in violation of the Fourth

Amendment.[4]  The Government opposes the motion, asserting that the search was lawfully

conducted as a protective sweep incident to Lara Thoma's arrest.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and
> seizures, shall not be violated, and no Warrants shall issue,

---

[4]      Although no evidence was presented regarding Defendant Lavallee's interest in
the 1561 Holloway Road home, the indictment alleges that this was Defendant Lavallee's
residence.

7

> but upon probable cause, supported by Oath or affirmation,
> and particularly describing the place to be searched, and the
> persons or things to be seized.

U.S. Const. amend. IV.  "One's home is sacrosanct, and unreasonable government intrusion into

the home is 'the chief evil against which the wording of the Fourth Amendment is directed'."

United States v. Zimmerman, 277 F.3d 426, 431 (3d Cir. 2002) (quoting Payton v. New York,

445 U.S. 573, 585 (1980)).  In determining whether a search of a home was reasonable under the

Fourth Amendment, the Supreme Court has articulated the balance between individuals' Fourth

Amendment right to be secure in their homes and legitimate governmental interests as follows:

> It goes without saying that the Fourth Amendment bars only
> unreasonable searches and seizures.  Our cases show that in
> determining reasonableness, we have balanced the intrusion on the
> individual's Fourth Amendment interests against its promotion of
> legitimate governmental interests.  Under this test, a search of the
> house or office is generally not reasonable without a warrant issued
> on probable cause.  There are other contexts, however, where the
> public interest is such that neither a warrant nor probable cause is
> required.

Maryland v. Buie, 494 U.S. 325, 331 (1990) (internal citations omitted).  In Buie, the Supreme

Court explained the permissible scope of a warrantless search of a home that may lawfully be

undertaken in the course of an in-home arrest.

In Buie, police officers investigating an armed robbery committed by two men, one of

whom had reportedly been wearing a red running suit, obtained arrest warrants for two suspects

and executed one of the warrants at one of the suspect's houses.  Id. at 328.  Once at the home,

police entered and called out for anyone in the basement to come up.  Id.  Eventually, Buie

emerged from the basement and was placed under arrest.  Id.  At this point, one of the officers

entered the basement "in case there was someone else down there."  Id.  Once he reached the

basement, the officer noticed a red running suit lying in plain view on a stack of clothing and

seized it.  Id.

The Supreme Court vacated the appellate court's ruling that the search violated the Fourth

Amendment on the basis that the officers lacked probable cause to believe that a "serious and

demonstrable potentiality for danger" exists.  In vacating this ruling, the Court began by defining

the nature and scope of a "protective sweep" that officers may lawfully undertake in connection

with an arrest in a suspect's home:

> A "protective sweep" is a quick and limited search of premises,
> incident to an arrest and conducted to protect the safety of police
> officers or others.  It is narrowly confined to a cursory visual
> inspection of those places in which a person might be hiding.

Id. at 327.  Initially, the Court held that because they were in possession of an arrest warrant,

police officers were lawfully permitted to enter Buie's home and search anywhere in the home in

which he might be found.  "Once he was found, however, the search for him was over, and there

was no longer that particular justification for entering any rooms that had not yet been searched."

Id. at 333.  In addition to this authority, the Court held that:

> as an incident to the arrest the officers could, as a precautionary
> matter and without probable cause or reasonable suspicion, look in
> closets and other spaces immediately adjoining the place of arrest
> from which an attack could be immediately launched.  Beyond that,
> however, we hold that there must be articulable facts which, taken
> together with the rational inferences from those facts, would
> warrant a reasonably prudent officer in believing that the area to be
> swept harbors an individual posing a danger to those one the arrest
> scene.

Id. at 334 (emphasis added).  The Court further clarified the limited nature of the protective

search that would be authorized under such circumstances:

> We should emphasize that such a protective sweep, aimed at
> protecting the arresting officers, if justified by the circumstances, <u>is
> nevertheless not a full search of the premises</u>, but may extend only
> to a <u>cursory inspection</u> of those spaces where a person may be
> found.  The sweep lasts no longer than is necessary to dispel the
> reasonable suspicion of danger <u>and in any event no longer than it
> takes to complete the arrest and depart the premises</u>.

<u>Id.</u> at 335 (emphasis added).

Notwithstanding Agent Eagles's testimony that the search of 1561 Holloway Road was a mere "protective sweep," the testimony of the officers involved in the search demonstrates that the search for Dawan Oliver was considerably more extensive and protracted than the type of search authorized by the Supreme Court in <u>Buie</u>.  In its brief, the Government asserts that "[t]he sweep conducted was not a full-blown search for evidence."  (Doc. No. 43.)  The testimony elicited during the hearing before the Court, however, stands in direct contradiction to the characterization of the search as limited.  It was not.  Agent Eagles testified that the search took approximately 45 minutes.  Officers Rettig and Barboza testified that task force members searched the house at least twice, with officers backtracking and checking each other's work.  Indeed, Officer Rettig acknowledged that it was the officers' intention to search "every nook and cranny" of the home.  (Tr. 46.)  Officers conducted an initial sweep of the home that took between 10 and 25 minutes to complete, without discovering Oliver.  Officer Rettig characterized the second search of the home as "time consuming" and "meticulous," and in marked contrast to the initial sweep that he described as a "quick, clean sweep" lasting approximately ten minutes.[5] (Tr. 51.)  The officers' own description of the manner in which the search was conducted belies any argument that the search was merely protective and cursory.

-------

[5]       As noted, Dawan Oliver was not discovered during this initial sweep of the home.

10

Furthermore, even where officers articulate specific facts that caused them to believe reasonably that the house harbored an individual posing a danger to officers, <u>Buie</u> explicitly limits the permissible scope and duration of a protective sweep to the amount of time it is "necessary to dispel the reasonable suspicion of danger <u>and in any event no longer than it takes to complete the arrest and depart the premises</u>." <u>Buie</u>, 494, U.S. at 336 (emphasis added). The testimony offered during the hearing established that Thoma had been arrested and detained on the premises for approximately 45 minutes while officers searched the home twice before discovering Dawan Oliver. Officer Rettig testified that after Thoma had been handcuffed, it would likely have taken only "a couple of minutes" to take her out of the house. (Tr. 43.) Accordingly, the search of the premises that followed Thoma's arrest was more lengthy and extensive than necessary under the circumstances, and in any event far exceeds the scope of a protective sweep authorized by <u>Buie</u>.[6]

The Government also relies on <u>Chimel v. California</u>, 395 U.S. 752 (1969) to justify the search that ensued following Thoma's arrest. <u>Chimel</u> provides no support for – and, in fact, undermines – the Government's position. In <u>Chimel</u>, the Supreme Court held that in the absence of a search warrant, the justifiable search incident to an in-home arrest could not extend beyond the arrestee's person and the area from which the arrestee might have obtained a weapon. <u>Buie</u>,

---

[6]     The Court notes that it would appear somewhat artificial to gauge the timing of the search against Thoma's arrest, given that the task force had come to the house not with the intention of arresting Lara Thoma but with the stated purpose of finding Dawan Oliver. Nevertheless, officers were not in possession of a warrant to search 1561 Holloway Road, and made entry into the home only after Thoma unlocked a door, allowing officers to effect her arrest within the house. Accordingly, the Court finds that the length of the search – which the Government attempts to justify as a protective sweep made in the course of Thoma's arrest – must necessarily be judged in relation to the timing and circumstances of her arrest.

494 U.S. at 336 (explaining <u>Chimel</u>).  Moreover, <u>Chimel</u> expressly found that although the

search of an arrestee's person and places within his immediate control was permissible in the

course of an arrest, that justification did not extend to

> routinely searching any room other than that in which an arrest
> occurs – or, for that matter, for searching through all the desk
> drawers or other closed or concealed areas in that room itself.
> Such searches, in the absence of well-recognized exceptions, may
> be made only under the authority of a search warrant. The
> "adherence to judicial processes" mandated by the Fourth
> Amendment requires no less.

<u>Chimel</u>, 395 U.S. at 763.  In announcing that protective sweeps could be justified under certain

circumstances, the Court in <u>Buie</u> took care to harmonize its holding with <u>Chimel</u>, and

emphasized that:

> The type of search we authorize today is far removed from the
> "top-to-bottom" search involved in <u>Chimel</u>; moreover, it is
> decidedly not "automatic," but may be conducted only when
> justified by a reasonable, articulable suspicion that the house is
> harboring a person posing a danger to those on the arrest scene.

<u>Buie</u>, 494 U.S. at 336.  It bears emphasizing that Buie expressly limited the duration of such

protective searches by the time necessary to effect the in-home arrest of the suspect – in this case,

Thoma.  The Court finds that the search that took place at 1561 Holloway Road on January 27,

2006, exceeded the limited protective sweep authorized by <u>Buie</u>, and <u>Chimel</u> provides no support

for the Government's contention that the search of the entire house was lawful incident to

Thoma's arrest.

    For all of the foregoing reasons, the Court finds that evidence of Dawan Oliver's seizure

from the residence must be suppressed as to Defendant Lavallee because the seizure was effected

in connection with an unreasonable warrantless search of Defendant's home.

**B.      Custodial Interrogation**

Defendant Lavallee has also moved to suppress certain false statements that she made in response to questioning by Agents Eagles and Hill-Larson during the course of the search, arguing that she was not provided <u>Miranda</u> warnings before making the statements that form the basis for the charges in the indictment.  The Government has objected to the motion, arguing that Lavallee was not in custody at the time she was questioned, and therefore the agents were under no obligation to Mirandize her.  Additionally, the Government argues that because the statements were "exculpatory," the <u>Miranda</u> rule should have no application under the facts of this case. (Doc. No. 43, at 8.)

The Government's second argument may be disposed of quickly.  In <u>Miranda</u>, the Supreme Court held that:

> the prosecution may not use statements, <u>whether exculpatory or inculpatory</u>, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

<u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) (emphasis added).  Accordingly, whether Lavallee's statements are characterized as exculpatory or inculpatory is of no moment; instead the relevant inquiry is whether Lavallee was in custody at the time the agents questioned her

about Dawan Oliver and whether he was in the house.[7]

A "custodial interrogation" is questioning "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Rhode Island v. Innis, 446 U.S. 291, 298 (1980) (quoting Miranda, 384 U.S. at 444). A "custodial interrogation is not susceptible of an exact definition . . . the determination . . . must be made on a case-by-case basis." United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999) (citations omitted). Courts consider a variety of factors in determining whether a person was in custody, including: (1) whether the officers told the suspect she was not under arrest or free to leave; (2) the location of physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning. United States v. Willaman, 437 F.3d 354, 359-360 (3d Cir. 2006) (citations omitted).

"The ultimate inquiry is: 'whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" Leese, 176 F.3d at 743 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1993) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). In order for a person to be in custody when she has not been arrested, "something

---

[7]     Aside from the fact that Miranda applies with equal force to exculpatory and inculpatory custodial statements, the Court finds it difficult to credit the Government's assertion that the answers to Agents Eagles's and Hill-Larson's questions were "exculpatory." The principal question asked of the Defendant was whether Dawan Oliver was in the home. Defendant's answer to this question, and to the general questions regarding her knowledge of Dawan Oliver, form the basis for the charges in the indictment. Furthermore, although the Government asserts that had Lavallee provided a truthful answer to the questions, she would not have faced prosecution, it seems equally probable that had Lavallee admitted that Oliver was hiding in the house, she would have faced prosecution for harboring a fugitive.

must be said or done by the authorities, either in their manner of approach or in the tone or extent

of their questioning, which indicates that they would not have heeded a request to depart or to

allow the suspect to do so." Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974) (quoting

United States v. Hall, 421 F.2d 540, 545 (2d Cir. 1969).

In announcing the prophylactic rule in Miranda, the Supreme Court contrasted the

coercive nature of the station house with the familiar surroundings of a suspect's home:

> In his home [the accused] may be confident, indignant, or
> recalcitrant. He is more keenly aware of his rights and more
> reluctant to tell of his indiscretions or criminal behavior within the
> walls of his home. Moreover his family and other friends are
> nearby, their presence lending moral support. In his own office, the
> investigator possesses all the advantages. The atmosphere suggests
> the invincibility of the forces of the law.

Miranda, 384 U.S. at 449-450.  Nevertheless, it is clear that in certain circumstances, a suspect

may considered to be in custody within his own home.  See Orozco v. United States, 394 U.S.

324, 326-27 (1969) (suspect held to be in custody and subject to Miranda requirement where

police officers burst into his bedroom in the middle of the night and interrogated him while he

was in his bed, and where the officers testified that he was not free to leave and was technically

under arrest).  However, the United States Court of Appeals for the Third Circuit has cautioned

that "the mere presence of the police at the subject's home cannot be equated, per se, with the

deprivation of significant freedom of action with which the Court in Miranda dealt." Virgin

Islands v. Berne, 412 F.2d 1055, 1059-1060 (3d Cir. 1969).

In its brief opposing Defendant's motion, the Government points to several cases in

which courts have found in-home interrogations were not custodial for purposes of Miranda, and

from these cases the Government asserts that when "questioning takes place in surroundings

familiar to the accused, it is less likely that the defendant was in custody." (Doc. No. 43, at 9.)

For example, in <u>Beckwith v. United States</u>, 425 U.S. 341 (1976), the Supreme Court framed the

issue before the Court as "whether a special agent of the Internal Revenue Service, investigating

potential criminal income tax violations, must, in an interview with a taxpayer, not in custody,

give the warnings called for by this Court's decision in <u>Miranda v. Arizona</u>, 384 U.S. 436

(1966)." <u>Beckwith</u>, 425 U.S. at 341.  In <u>Beckwith</u>, IRS agents went to Plaintiff's house and

requested to speak with the suspect regarding an investigation into criminal tax fraud.  <u>Id.</u> at 342-

43.  The suspect invited the agents into his home, proceeded to finish getting dressed, and then

joined the agents at the dining room table where one of the agents advised him that they were

investigating his tax returns for several years and then presented him with a card advising him of

his right against self-incrimination.  <u>Id.</u> at 343.  Petitioner responded that he understood his

rights, and then engaged in an interview that the agents testified was both "relaxed" and

"friendly."  <u>Id.</u>  Petitioner was subsequently charged with tax fraud, and he moved to suppress

statements given to the IRS agents on the grounds that he should have been Mirandized prior to

the in-home interview.  In affirming the court of appeals, the Supreme Court rejected Petitioner's

argument, finding that he "[a]n interview with Government agents in a situation such as the one

shown by this record simply does not present the elements which the <u>Miranda</u> Court found so

inherently coercive as to require its holding."  <u>Id.</u> at 347.

  In <u>United States v. Rith</u>, 164 F.3d 1323 (10th Cir. 1999), another case cited by the

Government, the United States Court of Appeals for the Tenth Circuit rejected appellant-

defendant's argument that certain incriminating statements he made during an in-home

interrogation after being Mirandized should be suppressed because they were made in close

proximity to other statements he made during the same interview before he was Mirandized that were, in fact, suppressed.  In rejecting the appellant's fruit-of-the-poisonous tree argument, the court's analysis did not turn on whether the appellant was in custody and entitled to <u>Miranda</u> warnings, but instead on whether the appellant's statements made <u>after</u> he was Mirandized were voluntary.  In answering this question affirmatively, the court noted that the suspect was questioned in his own home, and there was no evidence that appellant was susceptible due to age, intelligence, or education.  The analysis in <u>Rith</u> is of limited value to the instant case.

In an early case authored by Judge Henry Friendly that openly wrestled with the question of what constitutes "custodial interrogation" under <u>Miranda</u>, the United States Court of Appeals for the Second Circuit found that a seventeen-minute interview with a bank robbery suspect conducted in the suspect's apartment by three law enforcement officers who were welcomed in by the suspect upon request was not custodial.  <u>United States v. Hall</u>, 421 F.2d 540, 542 (2d Cir. 1969).  Although finding that the interview was non-custodial, the court stated that "we would not have thought . . . that questioning in the home could never come within the mandate of <u>Miranda</u>; we do think it suggests that in the absence of actual arrest, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."  <u>Id.</u> at 545.  In weighing a number of factors, including the previously referenced fact that the suspect welcomed the officers into his apartment upon their request, the court noted that the evidence presented gave "no reason to believe the agents would not have departed on request or allowed Hall to do so . . . ."  <u>Id.</u> at 546.

Perhaps most closely on point with the case at bar, the majority of a panel of the Third

17

Circuit held, over a strong dissent from Judge Rendell, that an in-home interrogation of a

defendant suspected of extortion and tax fraud was not "custodial" in spite of the fact that the

interview was conducted early in the morning while agents executed a search warrant, and in

spite of the fact that fourteen federal agents were present at the defendant's home during the

interrogation.  United States v. Vidal, 85 Fed. Appx. 858 (3d Cir. Jan. 27, 2004).  In Vidal,

fourteen FBI and IRS agents arrived at the defendant's home to execute a search warrant.  Id. at

859.  Two agents approached the front door while twelve other agents waited outside the house

or in their vehicles on the street.  Id.  The defendant's wife answered the door, at which point the

two agents presented her with the search warrant.  Id.  She invited the agents into the house, after

which they conducted a brief protective sweep to secure five firearms the defendant had

previously told the agents he owned.  Id.  After the sweep was completed, nine agents searched

the house for computer records.  Id.  Two agents remained outside the home.  Id.  At no time was

the defendant frisked, handcuffed, or touched; no firearm was displayed; and the defendant was

permitted to get dressed while accompanied by an agent.  Id.

The agents testified that they questioned the defendant for approximately one hour and

fifteen minutes.  Id. at 860.  During the interview, the defendant was described as "very friendly

and hospitable," "forthcoming," "cooperative," "relaxed," and demonstrated no hesitation in

answering the agents questions.  Id.  The defendant exhibited similar behavior during two prior

interrogations in his home.  Id.  The defendant was permitted to move about his house in the

presence of an agent.  Id.  He was permitted to use the bathroom with the door partially ajar.  Id.

The defendant held his daughter on his lap during the questioning and his wife offered the agents

coffee.  Id. at 860 and 862.

18

The majority of the panel found that the foregoing factors demonstrated that the defendant was not in a "custodial situation," even though they were "given some pause by the number of agents involved." Id. at 862. Dissenting, Judge Rendell found that the circumstances surrounding the interrogation amounted to a custodial setting. Id. at 863. Judge Rendell noted that the warrant was executed very early in the morning, and followed several previous interrogations, thus causing her to find that this final interrogation "reflected an escalation in force and a 'bearing down' on the defendant." Id. at 864 (quoting Leese, 176 F.3d at 744). Judge Rendell particularly highlighted the fact that the defendant's movements about his home were closely monitored in such a way that would not have caused him to feel free to leave the scene. Id. Considering the totality of the circumstances, including the fact that the defendant's wife was not even permitted to retrieve a book for her daughter without agents accompanying her, Judge Rendell believed the officers had "effectively transformed the house into an occupied outpost." Id.

As review of the above cases suggests, police questioning of a suspect or any other person in their own home will not ordinarily be deemed custodial, absent extraordinary circumstances that would cause a reasonable person to believe that their freedom had been significantly restrained. Upon careful consideration, the Court finds that this case presents an exception to that general rule. The record reveals that after the task force had converged upon, and into, Defendant's home following Thoma's arrest, Lavallee and one of her roommates were instructed to sit together on a couch in the living room while other officers commenced an intensive search of the

premises in an effort to find Dawan Oliver.[8]  Although neither Lavallee nor Gillespie were

formally placed under arrest, the testimony from the task force officers and FBI agents

demonstrates that while Lavallee and Gillespie were directed to sit in the living room, the

remainder of the house had been taken over in a considerable show of force, with approximately

ten law enforcement officers fanning out throughout the home with their weapons drawn in

search of Oliver.  Although Agents Eagles and Hill-Larson testified that, hypothetically, the

women were free to leave the house, neither woman was so advised, and the circumstances

would not have caused a reasonable person to believe they were free to move about, or to leave

the premises.  Indeed, Agent Hill-Larson testified that the women would not have been permitted

to go upstairs in the home until the search had concluded.  (Tr. 58.)  Hill-Larson testified further

that Defendants Lavallee and Gillespie remained seated on the couch throughout the search, and

she remained with the women throughout this time.[9]  When aggregated together with the

circumstances of the task force's entry into the home and the ensuing search of the home by a

significant number of armed law enforcement officers, these facts lend further support to a

finding that objective people in the position of Lavallee and Gillespie would not have felt free to

leave, but in fact would have reasonably felt themselves restrained.

   The Court also finds the facts of this case demonstrate that the house was not the familiar

---

[8]  Agent Hill-Larson testified that the women were merely "requested" to sit on the couch, but Agent Eagles – the leader of the task force and the agent who directed the women to the couch – testified that the women were "instructed" to sit on the couch.  (Tr. 13, 58.) Additionally, Agent Hill-Larson testified that by the time she entered the living room, Defendants Lavallee and Gillespie were already seated on the couch.  (Tr. 55-56.)

[9]  Agent Eagles testified that "[I] stayed with them until Agent Hill-Larson had come in the front and [I] asked her to watch the two of them."  (Tr. 14.)

and comfortable environment that the <u>Miranda</u> Court asserted would minimize the coercive

nature of a police interrogation.  Instead, the totality of the circumstances of the task force's

approach to, entry into, and search of the home caused the residence to become a quite unfamiliar

environment.  When one considers the fact that the home is relatively small, as evidenced by

photographs submitted by the Government, <u>see</u> Government Exhibit 2, its occupation by more

than ten armed officers who entered with some force and their weapons drawn and proceeded to

conduct an invasive, warrantless search of the premises substantially eviscerated any feeling of

security that a resident would reasonably be expected to perceive.  Although the Court does not

find that the residence had necessarily become the equivalent of a station house, the Court does

find that the facts of this case were such that the "investigator possessed all the advantages" and

the atmosphere suggested "the invincibility of the forces of law."  <u>Miranda</u>, 384 U.S. at 449-450.

An additional fact lends further support to the Court's findings that an objectively

reasonable person would not have felt free to leave and would have reasonably perceived

themselves to be significantly restrained.  At some point during the search of the home, relatives

of Blair Gillespie arrived at the residence to retrieve Gillespie's baby.  Although task force

members denied knowledge of defense counsel's assertion that one of the members had advised

Gillespie to contact the relatives because she was "going to jail," no testifying agent or officer

could conclusively state who contacted the relatives, nor when they were contacted.[10]  (Tr. 26,

60.)  Instead, Agent Eagles offered his assumption that the relatives had been contacted prior to

---

[10]     Specifically, Agents Eagles and Hill-Larson each testified that they did not tell
Gillespie that she was going to jail, and that they did not hear a task force member make such a
statement to that effect.  (Tr. 26, 60.)  When asked whether someone from the task force told
Gillespie to contact somebody to pick up her baby, Agent Eagles answered, "Not to my
knowledge."  (Tr. 27.)

the task force's arrival.  (Tr. 27.)  No evidence was offered to substantiate such speculation, and the Court finds that under the totality of the circumstances, it was just as likely – if not more so – that the women contacted the relatives because they perceived that they were about to be arrested or otherwise detained.

One factor that gives the Court some pause before concluding that the environment amounted to a custodial setting is that Agents Eagles and Hill-Larson questioned the Defendants briefly and about limited subject matter.  In the case of Agent Eagles, he testified that he asked the women whether Dawan Oliver was currently in or had ever been in the house.  (Tr. 14.)  Agent Hill-Larson questioned the women about a large shirt that she observed in the living room in an effort to gather evidence as to whether Oliver was in the house.  (Tr. 59-60.)  Although it is true that the length of interrogation is a factor to be considered when evaluating whether a suspect is in custody, it is but one factor and must be considered together with many others.  The Court finds that the dramatic entry into the home, conducted with no small degree of force and intimidation – whether intended or not – substantially outweighs in import the limited duration of the questioning.  Furthermore, the questions directed at Defendants Lavallee and Gillespie were, at least in one important respect, questions to which any answer would have potentially subjected the Defendants to incriminate themselves.  Indeed, the reasonable basis for this finding is evident by the fact that the Defendants' denial of knowledge of Dawan Oliver and his presence in the home form the predicate for criminal charges brought against them.  Had Defendants admitted that Oliver was secreted in an upstairs compartment, it seems equally likely they would have been prosecuted for harboring a fugitive – a charge that was, in fact, brought against both women.

22

The circumstances that preceded the questioning of Lavallee and Gillespie, and the coercive circumstances that surrounded the task forces entry into and occupation of Defendant's home, stand in sharp contrast to those presented in <u>Beckwith</u> and <u>Hall</u>, both of which involved interrogations that were conducted after officers had been welcomed into the suspects' homes, and where there was no show of force – let alone the dramatic display at issue in this case – that would cause an objectively reasonable person to feel themselves in a coercive environment.  For similar reasons, particularly the hostile environment in which the women were questioned about Oliver's whereabouts, together with the heightened show of force involved in the search, places this case on different footing than the interrogation found to be non-custodial in <u>Vidal</u>.  For all of the foregoing reasons, the Court finds that when Agents Eagles and Hill-Larson questioned Defendant Lavallee on January 27, 2006, the in-home environment had been rendered custodial, and Defendant was required to be Mirandized prior to being questioned.

**IV.**    **Conclusion**

For the reasons set forth above, Defendant Lavallee's motion to suppress evidence and incriminating statements made during the course of the warrantless search of her home on January 27, 2006, will be granted.  An appropriate order follows this memorandum.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 1:06-CR-90-03** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **NICOLE LAVALLEE,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

**AND NOW**, this 25th day of May 2006, upon consideration of Defendant's Motion to

Suppress Evidence (Doc. No. 35), and for the reasons fully set forth in the within memorandum,

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED**.


S/ Yvette Kane
_____
Yvette Kane
United States District Judge